CARAWAY, J.
| ] This case involves a large oil and gas lease affecting 1805.34 acres in the southern part of Caddo Parish. The lessors and lessee entered into an 18-month extension agreement in 2007, months prior to the announcement of the Haynesville Shale discovery. The extension of the 3-year primary term of the lease from 3 years to 4 ½ years occurred at a time when a large portion of the lease was already developed by production in units for depths above the Haynesville Shale with only 168.95 acres of the lease experiencing no production activities in 2007 as the original primary term *449 was ending. The lease contained a horizontal and vertical Pugh clause prompting the lessee’s need for an extension of the primary term. The extension agreement which was executed described its application to the “full description of the lands covered” in the original lease. In the spring of 2008, plaintiffs sued the lessee to reform the extension agreement making it applicable only to the 168.95 acres and not to the deep rights below the unitized production for the remaining acreage of the original lease. Following certain preliminary partial summary judgment rulings by the trial court, some of which are now contested in this appeal, a jury decided the issue of reformation of the parties’ act of extension, finding in favor of the lessee for the extension of the entire 1805.84 acres of the lease. For the following reasons, we affirm the judgment of the trial court in part and reverse in part, and remand the case for further proceedings.
| JFacts
The Plaintiffs,[1] Cynthia Fry Peironnet (“Peironnet”), Elizabeth Fry Franklin (“Franklin”) and Eleanor Baugnies de St. Marceaux (“Marceaux”) (hereinafter collectively the “Plaintiffs”), are owners of an undivided 5/6ths interest in large tracts of land in Caddo Parish. One co-owner with the Plaintiffs, Pamela Jeter Comegys (“Comegys”), who owns the remaining l/6th interest, is not a plaintiff. On June 22, 2004, Plaintiffs and Comegys executed an oil and gas lease (hereinafter the “Lease”) to Prestige Exploration, Inc. (“Prestige”). The Lease was for a 8-year primary term and covered 1805.34 acres of land, comprising various tracts in the Elm Grove/Caspiana Field. The initial bonus for the Lease was calculated on a total acreage basis for $100 per acre. The Lease contained a Pugh clause in paragraph 7, which operated at the end of the primary term or thereafter, as set forth and discussed in detail below.
The ownership of two of the Plaintiffs, Peironnet and Franklin, comprising a two-thirds interest in the property, was managed by Regions Bank, whose representative acted on their behalf in the negotiations for the Lease. Prestige, which is an independent landman group, acquired the Lease on behalf of Matador Resources Company (“Matador”). On September 24, 2004, Prestige assigned the Lease to Matador.
The various tracts of the Lease extended into eight governmental sections of land. During the primary term of the Lease, Matador | ^successfully explored and developed the Cotton Valley formation in five of the eight sections. The Cotton Valley formation was unitized by the Office of Conservation for sectional units, and the unit orders for the field reveal that the formation is described as extending generally to depths of approximately 10,300 feet.
Therefore, in the late spring of 2007 as the Lease approached the end of its primary term, the producing Cotton Valley wells were providing production royalties to Plaintiffs for their acreage in the five units. Yet, the Plaintiffs’ tracts in three other nearby sections, Section 35, Township 15 North, Range 12 West, and Sections 31 and 29 in Township 15 North, Range 11 West (hereinafter “Sections 35, 31 and 29” respectively), were not yet developed by a Cotton Valley well in a unit for each of those sections. Matador desired to explore those undeveloped Cotton Valley units, but the operation of the Pugh *450 clause presented an obstacle to its maintenance of the Lease in those sections. Since operations on the Plaintiffs’ acreage in Section 29 did begin in June 2007, immediately prior to the end of the primary term, the 168.95 acres (hereinafter “the 168.95 Acres”) in Sections 35 and 31 was the only acreage where Cotton Valley operations had not occurred by June 22, 2007. This dispute concerns Matador’s negotiations with Plaintiffs in the spring and summer of 2007 to extend its rights under the Lease by the execution of a lease extension agreement.
The Lease contains the typical haben-dum clause providing that at the end of the primary term on June 22, 2007, the Lease shall extend and be maintained “for so long thereafter as oil and/or gas is produced in paying ^quantities from the leased premises, or land pooled therewith as herein permitted,” Nevertheless, modifying this extended term of the habendum clause and providing for lease division after the primary term, the Pugh clause (paragraph 7) of the Lease provides, in pertinent part, as follows:
7. After the expiration of the primary term hereof, this lease shall remain in force and effect as to all of the lands covered thereby so long and only so long as Lessee shall conduct continuous drilling operations on the leased premises or on land pooled therewith as hereinafter provided. The term “continuous drilling operations” shall mean not more than ninety (90) days shall expire between the completion as a producer or the abandonment as a dry hole of a preceding well and the commencement of actual drilling operations for the next well.
If Lessee fails to conduct continuous drilling operations on the leased premises or on land pooled therewith, this lease shall thereupon terminate as to all of the leased premises, except as follows:
a) If Lessee has completed a well (or wells) on the leased premises or on land pooled therewith that is producing or capable of producing oil or gas in paying quantities and is included within- a pooled unit (or units), then this lease shall continue in effect as to the lands covered hereby that is within the bounds of such unit (or units), but only to the depth specified herein;
* S; Si * * Si
d) In each such above case the acreage around such oil or gas well so held is to be limited from the surface to the depth of 100 feet below the stratigraphic equivalent of the deepest depth drilled; provided, however, that if any governmental rule or authority prescribes or permits a spacing pattern for the orderly development of the field or allocates a producing allowable based in whole or in part on acreage per well, then any acreage retained hereunder may include as much additional acreage as may be so prescribed, permitted or allocated, but only to the depth herein specified;
[[Image here]]
f) It is the intention of the parties hereto that upon the cessation of continuous drilling operations by Lessee upon the leased premises pursuant to this Paragraph 7, each such area containing a well producing or capable of producing oil or gas in paying quantities shall be treated as constituting a separate lease, and neither production from nor operations on any such area shall maintain this lease in force as to any other area.
|fiAdditionalIy, with the Pugh clause definition of “continuous drilling operations” employing the term “actual drilling operations,” an additional definition of “actual drilling operations” is provided in paragraph 8 of the Lease, as follows:
*451 8. Whenever used in this lease, the words “drilling operations” or “operations” shall mean operations for and any of the following: actual pad construction, drilling, testing, completing, reworking, recompleting, deepening, sidetracking, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil or gas. The words “actual drilling operations” shall mean having the bit in the ground and rotating same.
In May 2007, Matador began negotiations with Plaintiffs to extend the Lease beyond the primary term of June 22, 2007. At that time, the undeveloped Lease acreage in Sections 35, 31 and 29 would possibly be affected by the division of the Lease described in the Pugh clause, causing Matador to lose its lease rights for those sections. Furthermore, upon the occurrence of the condition triggering the Pugh clause, the undeveloped depths below the Cotton Valley formation in the producing sectional units (hereinafter the “Deep Rights”) would be released from the coverage of the Lease in accordance with subsection (d) of the Pugh clause.
The development facts which ultimately occurred for those three sections in 2007 were as follows:
• On June 15, 2007, the Peironnet 29 Well was spudded on the Plaintiffs’ property for the Cotton Valley unit in Section 29;
• On August 6, 2007, the Peironnet 29 Well was completed as a producer in the Cotton Valley formation; and
• No wells were drilled in Sections 35 and 31 during that time period.
| (¡Additionally, following the completion of the Peironnet 29 Well in August 2007, the record shows that no well was spudded affecting any part of the entire 1805.34 acres of the Lease premises for a period of over 90 days. The next well following the completion of the Peironnet 29 Well was the Bradway 24 Well in Section 24, Township 14 North, Range 12 West, a Cotton Valley unit well affecting a portion of the Lease acreage. The Bradway 24 Well was spudded on November 16, 2007.
In May 2007, as negotiations were to begin, Kevin Donahue, a land manager at Matador, contacted Mac Guarino, the owner of Prestige and Coastal Land Services, Inc.,[2] and hired his companies to obtain an extension of the Lease because, according to Donahue, “the Lease was going to expire as to certain sections that didn’t already have wells drilled on them.” Subsequently, Guarino appointed Russell Mouton as the lease broker in charge of handling the negotiations for extension of the Lease.
In early May 2007, Mouton called John Moore, Regions’ employee and agent for Peironnet and Franklin for the management of their property interests. Mouton testified that he told Moore that he “was extending a lease, the primary term of a lease for one year which contained 1805.34 acres.” Mouton also called Mareeaux, the unrepresented lessor, and discussed an extension of the Lease. According to Moore, Mouton called and stated that “the Matador leases were expiring and they — he needed to extend the 168.95 acres.” While Mouton testified that he told Plaintiffs that |7he wanted to extend the entire lease, he admitted that he never specifically discussed the Deep Rights in the producing *452 Cotton Valley units with Marceaux or Moore. According to Marceaux, Mouton told her that:
[t]he lease was going to be coming up and there were certain sections of the property that had not been drilled — or “spudded” is what he said — and they needed to extend the lease on those two pieces of, those two sections, and that was 168.95 acres.
Moore testified that he was initially offered a bonus amount of $33.34 per acre for the 168.95 Acres. Since the original bonus amount in 2004 was for $100 per acre for a three-year term and the initial proposed extension was for one year, Mouton testified that he interpreted the initial offer as one-third of the initial $100 per acre bonus paid in 2004.
After these initial contacts, Moore and Marceaux each received a follow-up letter dated May 15, 2007, from Mouton. The caption of both letters read:
Cynthia Fry Peironnet and Elizabeth Fry Franklin
Oil, Gas and Mineral Lease Extension Section 35, T15N-R12W and Section 31, T15N-R11W
Caddo Parish, Louisiana
The letters first identified the Lease reciting its coverage of “1805.34 acres.” Thereafter, the following offer was extended:
Note that the acreage they leased in Sections 23, 24, 25, 26, and 36 are situated within current producing units operated by our client, Matador Resources Company. The subject Oil, Gas and Mineral Lease will expire on June 22, 2007 as to all acreage situated outside of currently producing units, being those lands laying in Sections 29 and 31 in Township 15 North, Range 11 West and Section 35 in Township 15 North, Range 12 West. We have scheduled to drill another well on your property situated in Section 29, Township 15 North, Range 11 West and expect that this well will be spudded in prior to the lease expiration date. However, we will need more time under the lease for us to develop their acreage in Sections 31 and 35.
^Accordingly, we are hereby requesting that they extend the existing lease for an additional one (1) year period which will allow us the time needed to develop this acreage. Enclosed herewith please find an Amendment of Oil, Gas and Mineral Lease (Extension of Primary Term) which will serve to add one (1) year to the primary term of the subject lease. The property in Sections 31 and 35 total 168.95 acres. Since we are extending the lease by one (1) year we will pay 1/3 of the original bonus or $33.34 per net acre owned. They each own a 1/3 interest in this property and will each be paid $1,877.61 to extend this lease for the one (1) year period.
In the event we do not spud our well in Section 29 prior to the expiration date of the lease, we will then send them an additional amount of $3,988.56 as payment for the 358.90 acres in that Section as well.
(hereinafter referred to collectively as “the May 15 Letter”).
As indicated, each of the letters from Mouton contained a written lease amendment (hereinafter the “Extension Agreement”). These forms which Mouton provided in May were in all respects identical to the instrument which was ultimately executed by Plaintiffs in August 2007, with the exception that the time for the extension was finally negotiated as 18 months instead of one year. Thus, the Extension Agreement, as first revealed in May and later executed in August, provided for an 18-month extension as follows:
*453 WHEREAS, an Oil and Gas Lease (hereinafter referred to as “said Lease”) was executed in favor of Prestige Exploration, Inc., as Lessee, by Cynthia Fry Peironnet, Elizabeth Fry Franklin, Pamela Jeter Comegys and Eleanor Baugnies de St. Marceaux, as Lessor(s), dated June 22, 2004, and recorded in Book 3703, Page 208, under Entry No. 1935029, records of Caddo Parish, Louisiana, reference being made to said Lease for a full description of the lands covered thereby and for all other purposes; and,
WHEREAS, said Lease is now owned by Matador Resources Company; and,
WHEREAS, said Lease provides for a primary term of three (3) years, commencing on June 22, 2004; and,
WHEREAS, it is the mutual desire of Lessor(s) and Lessee to amend said Lease to extend the primary term of said Lease for an ^additional eighteen (18) month period, from three (3) to four (4) years and six (6) months, commencing on June 22, 2004.
NOW THEREFORE, for and in consideration of the payment of TEN DOLLARS ($10.00) together with other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:
There shall be deleted from the Paragraph “2.” of said Lease, the words and figures “Three (3) years,” and substituted in their place, the words and figures “Four (4) years and six (6) months.” It is expressly understood that by this amendment, the primary term of said Lease is to be extended for an additional eighteen (18) month period, from its original three (3) year primary term to Four (4) year and six (6) month primary term.
Except as amended hereby, said Lease shall remain unchanged, and for the consideration above recited: (a) Lessor and Lessee do ratify, confirm, and adopt said Lease, as hereby amended, and acknowledge that the same is valid, subsisting and in full force and effect; and (b) Lessor does hereby grant, lease and let the lands described in said Lease to Lessee, its successors, sublessees and assigns, upon all and singular the terms and provisions of said Lease, as amended hereby.
Due to Mouton’s low offer of $33 per acre, Moore and Marceaux turned down this initial offer without reading the attached proposed form for the Extension Agreement. Yet, they stated that they read the letter and understood it to mean that Matador was seeking to extend only the 168.95 Acres in the nonproductive sections.
Upon request from Moore, Mouton sent Moore a letter on June 11, 2007, that contained a plat of the acreage that Matador desired to extend. The plat had previously been provided to Marceaux. Aside from the additional inclusion of Section 29 in the description of the sections, this letter contained the same caption as previously contained in the May 15 Letter. The plat had Sections 31 and 35 color-coded in a brownish-red color, and Section 29 color-coded in a blue, “indicating] it would probably be spudded in time.”
| min addition, the letter to Moore stated as follows:
After speaking to you June 8 by phone, I am sending you a highlighted plat you requested to show the lands we are interested renewing situated in Section 35 in Township 15 North, Range 12 West and Sections 29 and 31 in Township 15 North, Range 11 West in Caddo Parish, Louisiana. The subject Oil, Gas and Mineral Lease will expire on June *454 22, 2007 as to all acreage situated outside of currently producing units. We have scheduled to drill another well on the Peironnet, et al property situated in Section 29, Township 15 North, Range 11 West and expect that this well will be spudded in prior to the lease expiration date.
Based on the plat, the letters, and representations from Mouton, the Plaintiffs testified that they believed that Matador was only seeking an extension of the primary term for the 168.95 nonproductive acres. Nevertheless, on cross-examination, Moore was confronted with the language of the Extension Agreement which indicates that the extension was for the entire Lease for 18 months. He was asked about the implication from the proposed written form, with its reference to the “full description of the lands covered” by the Lease, that the extension included the “entire 1805 acres, all acres, all depths,” to which Moore replied:
Well, in that lease there was a horizontal severance clause so you’re asking a legal question but it was thought by me at the time that beyond the primary term of the lease that the deep rights would be open. We’re here because of what this document says, and I can answer your question and say, yes, it would extend the base lease, but that was not the intent of the parties. If I had authored it, it may have read quite differently but I did not author it. I did sign it.
As previously indicated, Mouton testified that he told Moore that he wanted to extend the Lease for all acreage, while admitting that the proposed extension’s effect on the Deep Rights was not specifically discussed. As attempted impeachment of that testimony, Plaintiffs introduced a copy of a June 13, 2007, email from Moore to Mouton stating | nthat he would be out of town. On the copy, Mouton wrote that he “told [Moore] that well is spudded in 29 and only dealing with 168 acres.” Nevertheless, Mouton was removed from the lease negotiations due to the failure to have obtained an extension by the end of the primary term of the Lease.
According to Moore, Donahue (the Matador land manager) was the next person to contact him regarding an extension of the lease. Moore testified that:
After I told Mr. Mouton that, you know, there wasn’t anything personal but I still felt like his offer was below market and he should just call me when he can offer more or have his boss call me, I did hear from, I believe, Kevin Donahue with Matador.
While Donahue initially made the same $33.34 per acre bonus for the 168.95 Acres, he eventually increased the amount to $75 per acre. Kevin Donhaue’s deposition testimony was introduced at trial. That testimony did not mention the details of any conversations or negotiations with Moore. Additionally, Donahue left Matador on June 28, 2007, before the extension was executed.
On August 22, 2007, Guarino sent Moore another offer and the written form for the Extension Agreement. The caption of this letter was stated as follows:
Amendment of Lease (Extension of Primary Term)
Lands of Cynthia Fry Peironnet, et al. Matador Resources Company (Elm Grove Prospect)
Caddo Parish, Louisiana
The letter stated that an amendment was attached for review and execution “which will serve to extend the primary term under the Cynthia Fry 112Peironnet, et al. lease dated June 22, 2004 for an additional eighteen (18) month period. Also enclosed are checks made payable to Cynthia Fry *455 Peironnet and Elizabeth Fry Peironnet [sic ], in the amounts of $4,224.00, as payment of the consideration agreed upon for the extension of the lease.” This offer for Peironnet’s and Franklin’s interests therefore reflected a per acre amount greater than the initial $83.34 per acre offer. After negotiations, the Plaintiffs ultimately received a bonus of $75 per acre. Concerning the one-third ownership interest which Franklin and Peironnet each owned, the calculation for $4,224 that each received was as follows: 168.95 acres x $75 per acre x 1/3 = $4,223.75, rounded to $4,224.00. The memo line on the August 22, 2007 checks stated that it was for: “Lease Extension (OGML dtd. 6-22-04).” Since Marceaux owned only a one-sixth interest, she received $2,111.85 as consideration for executing the Extension Agreement. The memo line on Marceaux’s check stated that it was for “OGML dtd: 6/22/04; 168.95 acres (lease ext.).”[3]
Since he had last communicated with Donahue, Moore testified that he called Guarino to make sure that the terms were the same. Guarino’s recollection was that he called Moore. Nevertheless, Guarino testified that he never talked to Marceaux. According to Moore’s testimony, Guarino
told [him] it was for 168.95 acres and he said that the only thing that was different was that the term of the extension had been changed from 12 months to 18 months. And I went on to ask him about how he arrived at the check amounts just to be sure that it was calculated out and we walk — we discussed that briefly but I multiplied $75 an acre times 168.95 and then times their proportionate interest and got those same check amounts that he referenced in the letter.
11sGuarino testified that he told Moore that he did “have authority to go ahead and pay [him] $75 an acre for the acreage outside of the existing production.” Nevertheless, both Moore and Guarino testified that they did not discuss the Deep. Rights.
As the Extension Agreement was executed in August 2007, the following is therefore a summary of the acting parties’ intentions for its scope. Marceaux stated that “[she] understood that we were going to be signing a lease extension for 168.95 acres to allow — to give them extra time to put in a well ... on Sections 31 and 35.” Moore testified that:
It was my understanding that it was what we had talked about from the inception of the proposal back in May, that it was that we were extending 168.95 acres for 18 months, not 12, and that payment would be based on the 168.95 acres times $75 per acre.
In contrast, Guarino stated that his intent was to “extend the whole lease,” an intention he thought was clear through the written form of the Extension Agreement which he and Prestige had drafted. On August 23, 2007, Moore express mailed the executed Extension Agreement back to Guarino. Moore’s reply stated that “enclosed is the executed Amendment of Oil and Gas Lease which extends the primary term under the Cynthia Fry Peironnet et al lease-dated June 22, 2004 for an additional eighteen (18) months.”
The question of the Extension Agreement’s effect on the Deep Rights came into focus with the announcements in early 2008 regarding the discovery of the productive potential of the Haynesville Shale formation in south Caddo Parish. As will be reviewed in further detail below, by early 2008, the Deep Rights to the remaining 1636.39 acres would have dropped from the coverage of the Lease if the Extension Agreement was limited to |14only the *456 168.95 Acres. While the Cotton Valley production for the six units for the 1636.39 acres, including the unit production for Section 29, remained ongoing from the end of the primary .term until the end of the 18-month extension, the first attempt for exploration of the Haynesville Shale or development of the Deep Rights for that acreage did not begin until June 2008.[4] Additionally, Section 35 was first attempted to be drilled in April 2008 for exploration of the Cotton Valley formation. Section 31 was never explored and developed for the Cotton Valley formation during the extended 18-month period, but it was drilled to test the Haynesville Shale formation in August 2009.
After receiving notice of Matador’s intent to create seven units in order to drill to the Haynesville Shale, Franklin and Peironnet filed suit against Matador on May 15, 2008, which claimed error in the Extension Agreement, damages, and attorney’s fees. Peironnet and Franklin sought to reform the Extension Agreement to affect only Sections 31 and 35 based upon the alleged mutual intent of the parties or ambiguity in the Extension Agreement. Claims of mutual and unilateral error were asserted. The alternative relief sought that the Extension Agreement be rescinded for failure of cause or fraud, and unjust enrichment.[5] Franklin and Peironnet also alleged that Moore and Regions lacked the authority to extend the Deep Rights without consideration,.essentially amounting to an invalid donation. |1sAlso, on May 15, 2008, Franklin and Peironnet filed a notice of lis pendens in the Caddo . Parish records citing the suit caption and the Extension Agreement.
On June 6, 2008, after the lis pendens was filed, Matador assigned its rights in the Lease below the Cotton Valley formations to Chesapeake Louisiana, LP (hereinafter “Chesapeake”). Thereafter in July and August 2008, Peironnet, Franklin, Co-megys, and Mareeaux granted to Petro-hawk Properties, L.P. (hereinafter “Petro-hawk”), oil and gas leases over their 1805.34 acres.
Comegys filed a petition of intervention on August 21, 2008, asserting claims against both Matador and Chesapeake. On December 3, 2008, Peironnet and Franklin filed an amended and supplemental petition, adding Mareeaux as an additional plaintiff and Chesapeake and Prestige as additional defendants.
In 2009, Matador filed motions for partial summary judgment. It requested that certain causes of action and issues be dismissed. A motion also sought to establish that the Extension Agreement as written is unambiguous. Chesapeake and Prestige ultimately joined Matador in the motion for partial summary judgment. In response, the Plaintiffs also filed a motion for partial summary judgment regarding reformation of the lease extension. Prior to the hearing on these motions, Comegys settled her lawsuit with the defendants.
The hearing on the partial summary judgment motions was held on September 8, 2009. At this hearing, the trial court granted the defendants’ |lfimotions dismissing certain causes of action or issues asserted by the Plaintiffs, including ambiguity of the Extension Agreement and unilateral error. The only issues that the *457 trial court did not dismiss involved mutual error, fraud, and Plaintiffs’ claim regarding continuous drilling operations for lease maintenance.
On November 25, 2009, Petrohawk intervened in the suit, requesting declaratory relief for the recognition of its leases from Plaintiffs and Comegys. Essentially, Pe-trohawk argued that it has an interest in seeking a rescission and/or reformation of the Lease and the Extension Agreement based upon its lease rights.
Through various other hearings, the trial court further limited the scope of the trial. In granting a motion for partial summary judgment, the trial court held that according to the 90-day continuous operations clause in the Pugh clause, the Lease “was maintained in its entirety until November 6, 2007-90 days after the completion of the Peironnet 29 No. 1 Well by Matador.” In addition, the trial court ruled that Petrohawk did not have the right to assert Comegys’ previously asserted cause of action for reformation of the Extension Agreement.
Due to the extensive record and possibility for confusion, the trial court separated the trial into three separate phases. In phase one, the jury addressed whether mutual error or fraud existed so that the Extension Agreement might be reformed and rescinded. The second phase involved the Plaintiffs and Petrohawk’s alternative claim that the Lease expired on or after December 22, 2008, due to Chesapeake’s failure to conduct continuous |17drilling operations. Finally, if the jury found in Plaintiffs’ favor, phase three would adjudicate the Plaintiffs’ claims for monetary damages.
The 5-day jury trial began in September 2010. In addition to the above evidence of the parties’ negotiations, Plaintiffs presented expert testimony concerning the practice and custom of the per-acre bonus calculations for leasing and the extension of leases. After presentation of the Plaintiffs’ case, the parties stipulated that the Plaintiffs did not adequately prove fraud and the jury was charged only regarding the claim of mutual error. In a single interrogatory, the jury decided that “mutual error requiring the lease extension be reformed to 168.95 acres” had not been proven.
After a hearing on December 13, 2010, for the second phase of the case, the trial court held that production activity involving the Haynesville Shale served to extend the Lease beyond the end of the extended primary term of December 22, 2008. Thus, the trial court ruled that the Lease was still valid and effective as to all acreage and depths.

Discussion

The Plaintiffs and Petrohawk now present assignments of error asserting:
1) Numerous issues of trial court error which allegedly occurred before and during the trial, adversely affecting the jury’s verdict;
2) Manifest error in the jury’s verdict regarding mutual error; and
3) Error in the trial court’s ruling in phase two of the proceedings regarding lease maintenance through continuous drilling operations after December 22, 2008.
| ^Additionally, Petrohawk asserts error in the trial court’s granting of the partial summary judgment dismissing its claim under its lease with Comegys.
Initially, however, consideration should be given to some of the basic aspects of the Lease which governed the parties’ contractual relationship leading up to the disputed Extension Agreement. These include: (1) the Lease bonus and the primary term, and (2) the effect of the Pugh clause upon the lessee’s rights after the *458 primary term. These were provisions of the Lease which were undisputedly contracted before the Extension Agreement ever occurred. We find that an understanding of these concepts is necessary and highly relevant for determination of the meaning and purpose of the Extension Agreement.
The bonus for a mineral lease is defined in the Mineral Code as the “money or other property given for the execution of a mineral lease.” La. R.S. 31:213(1). An early ruling of this court states that the bonus is “[t]he usual consideration which a lessee gives for the privilege of exploring for oil on the property.” Nelson v. Roy, 1 La.App. 654 (La.App. 2d Cir.1925). The lessee’s privilege for exploring during the primary term, however, imports no obligation on the lessee for drilling activities affecting the lease. The Mineral Code in Article 115 sets a maximum of 10 years in which the mineral lease may be effective without drilling or production activities by the lessee. La. R.S. 31:115. This respite period or term without the requirement for drilling or production activity is the primary term of the mineral lease. See Official Comment, La. R.S. 31:124.
11flThe parties’ Lease in this case was labeled “Paid-Up Oil and Gas Lease.” Thus, its three-year primary term was a fully paid time period in which the lessee could choose at its option to conduct operations. Additionally, there was no requirement for the lessee to pay money in the form of delay rentals during the three years. See La. R.S. 31:213(4).
In this light, the bonus of the Lease for securing this paid-up privilege and option period for the three years was calculated and paid on the basis of the entire 1805.34 acres. Importantly, however, when the Extension Agreement restated and extended those three years to a “Four (4) years and six (6) months” primary term, the calculation of the monetary payment was made on a different acreage basis. We view that payment in 2007 as a type of bonus payment. Even though the payment was not made for the initial execution of the Lease, it was given in exchange for additional time for Matador to have the privilege and option to conduct operations without the constraints of the conditions for operations imposed by the habendum clause and the Pugh clause which would operate after the end of the new 4 ⅛ year primary term. The question in this case is whether the additional time given to Matador was intended, like the original primary term, to allow the same respite from meeting those conditions for operations during the extended 18 months, or to allow something different.
Second, just as the parties debated to the trial court in advance of trial the interpretation of the Pugh clause and its “continuous drilling operations” concept,[6] we believe that it is important to first interpret the Pugh clause and |2nits ramifications in relation to: (1) what was occurring on June 22, 2007, at the end of the primary term; (2) the execution of the Extension Agreement; and (3) the actual operations which affected the Lease during the 18-month extension period. If, based upon the actual drilling activities in 2007 and *459 2008, the conditions set forth in the Pugh clause never occurred so as to divide the Lease, this dispute over the intended scope of the Extension Agreement is, of course, unnecessary.
In the Mineral Code, the Pugh clause is discussed in the Official Comment to Article 114. La. R.S. 31:114 and Official Comment. Article 114 provides the principle that operations on any portion of the lease “or on land unitized therewith” will maintain the lease “as to the entirety of the land burdened” by the lease. Hunter Co. v. Shell Oil Co., 211 La. 893, 31 So.2d 10 (1947). Nevertheless, this broad principle can be contractually changed in various manners by the inclusion in the lease of a Pugh clause. “Not all such clauses are identical.” Will-Drill Resources, Inc. v. Huggs Inc., 32,179 (La.App.2d Cir.8/18/99), 738 So.2d 1196, 1199, writ denied, 99-2957 (La.12/17/99), 751 So.2d 885. “The main purpose of a Pugh clause is to protect the landowner-lessor from the anomaly of having the entire property held under lease by production from a very small portion.” Id. at 1200. More particularly for the present case, this purpose may extend to ensure that the lessee will also diligently explore all depths underlying |2ithe lease premises. In such a case, the division of the lease occurs and only the developed depths are maintained under the lease with the other depths released by the Pugh clause. See Sandefer Oil & Gas, Inc. v. Duhon, 961 F.2d 1207 (5th Cir.1992).
The contractual release of lease acreage outside of an active unit with operations otherwise sufficient to maintain the entire lease is referred to as a vertical Pugh clause. The contractual release of depths lying below the producing depths of a well affecting the lease is referred to as a horizontal Pugh clause. It is undisputed that the Lease in this case contained both vertical and horizontal release provisions.
The horizontal and vertical Pugh clause provisions in a lease therefore ensure the lessor that upon the occurrence of defined contractual events related to the lack of development operations by the lessee, certain undeveloped lease acreage and depths will no longer be affected by the lease. In the absence of such lease division and release, the lessor’s remedy to free the undeveloped portions of a lease requires his assertion and proof that the lessee has failed to reasonably explore and develop those portions as a reasonably prudent operator. See La. R.S. 31:122 and Official Comments. The cost and difficulties of such litigation for the lessor stand in sharp contrast to the automatic contractual release of the undeveloped portions of the lease gained by the inclusion of the Pugh clause. See Ferrara v. Questar Exploration and Prod. Co., 46,357 (La.App.2d Cir.6/29/11), 70 So.3d 974, writ denied, 11-1926 (La.11/14/11), 75 So.3d 943; Noel v. Amoco Prod. Co., 826 F.Supp. 1000 (W.D.La.1993). This shows the significant value of the Pugh clause for the lessor.
In the May 15 Letter, Mouton’s statement that the “Lease will expire on June 22, 2007 as to all acreage situated outside the currently producing units” was recognition that the Pugh clause of the Lease prompted Matador’s need for an Extension Agreement. As it turned out, however, the possibility for the drilling for the Peir-onnet 29 Well, which was also discussed in the letter, did in fact occur before the end of the primary term of June 22. Therefore, from our interpretation of the Pugh clause and its “continuous drilling operations” provision, the Lease in its entirety remained in force and effect through the drilling of the Peironnet 29 Well and for 90 days after its completion as a producer on August 6, 2007. With this ruling, we agree with the trial court’s pretrial partial summary judgment concerning the effect of *460 the Pugh clause. Nevertheless, considering all facts of the well history for the lease acreage, we further conclude that on November 6, 2007, at the end of the “continuous drilling operations” resulting from the Peironnet 29 Well, the contractual conditions for total lease maintenance required by the Pugh clause ceased (hereinafter the “Pugh Clause Event”) and rights under the Lease would have terminated in the absence of the Extension Agreement.
Despite the maintenance of the entirety of the Lease for all depths and acreage which its Peironnet 29 Well ensured, Matador persisted in efforts from June through August for the Extension Agreement. The stated reason in the May 15 Letter for Matador’s need for the extension was because it l^would “need more time under the lease for us to develop your acreage in Sections 81 and 35.” This pressing need did in fact occur as the lease acreage in those sections and all other areas of the Lease were no longer affected by continuous drilling operations after November 6, when the Pugh Clause Event occurred.
Thus, on the effective date of the Extension Agreement on August 22, 2007, 16 days after the completion of the Peironnet 29 Well, Matador was under the 90-day time constraint imposed by the Pugh clause to commence further operations for the maintenance of the entirety of its lease rights by November 6. On the other hand, from the Plaintiffs’ perspective for their designs for the benefits of the Pugh clause, upon the Pugh Clause Event, Plaintiffs would receive the contractual release of all lease rights in Sections 31 and 35 and all of the Deep Rights. The parties’ negotiations and their disputed meeting of the minds for the scope of the Extension Agreement accordingly are framed for consideration in this context.
I.
Four assignments of error by Plaintiffs and Petrohawk can be grouped for consideration of the vice of consent issue addressed by the jury in this reformation action. They are:
1) The trial court erred in granting partial summary judgment on the issue of ambiguity;
2) The trial court erred in granting a partial summary judgment excluding Plaintiffs’ claim of unilateral error;
3) The trial court erred in instructing the jury on the elements of mutual error; and
1244) The trial court erred in directing the jury to disregard the closing argument of Petrohawk addressing the parties’ bargain (or the “you get what you pay for” argument).

Ambiguity of Extension Agreement

On the issue of ambiguity in the parties’ contract, Plaintiffs argue that the trial court erred in accepting the defendants’ “four corners” argument and granting a partial summary judgment on the issue of ambiguity. This ruling allowed Matador’s counsel in his opening statement to the jury to state the following without objection, while referring to the one-page Extension Agreement:
“you will be instructed in this case at some time by the Judge that he has ruled that this contract is clear and unambiguous.”
Nevertheless, when the actual jury charge was given, the following statements were made and the jury was not informed that the Extension Agreement was unambiguous:
A written contract that is clear and unambiguous should be enforced as writ *461 ten unless the landowners prove that the contract is the result of mutual error.
⅜ ⅜ ⅜ ⅜ ⅜ ⅝
Regardless of whether the language of the Lease Amendment seems clear to you or ambiguous to you, you may look at all of the evidence presented to determine whether the Lease Amendment does not accurately reflect the intent of both of the parties.
The trial court’s partial summary judgment in this case must be viewed as “dis-positive of a particular issue” under La. C.C.P. art. 966(E). The determination of whether the language of a contract is clear or ambiguous is a question of law. Stephenson v. Petrohawk Properties, L.P., 45,296 (La.App.2d Cir.6/2/10), 37 So.3d 1145. Summary judgment is appropriate for such decision regarding the law. The trial court’s ruling was |25a partial ruling on the “issue” of ambiguity, as opposed to a dismissal of one of Plaintiffs’ causes of action. Nevertheless, when that decided issue of law was most needed in this case for the charge to the jury, the jury was left on its own to choose “whether the language ... seems clear ... or ambiguous.”
The issue of ambiguity was necessary as a pretrial decision by the court for the ultimate determination of whether the jury would be charged to decide either (1) a case of interpretation of the contract’s language under Civil Code Articles 2048, et seq., if the written contract is ambiguous, or (2) a case of reformation of the written contract under Article 1848, La. C.C. art. 1848, if the written contract is unambiguous. While we agree with the trial court’s ruling that the one-page Extension Agreement, as written, was unambiguous, the lack of a jury charge reflecting the trial court’s ruling on ambiguity clouded the overall charge on the claim for reformation of the instrument for alleviation of any vice of consent.
The Extension Agreement was a conveyance made under private signature granting an incorporeal immovable, i.e. the extended mineral lease rights. Louisiana writing requirements for transactions affecting immovables governed the parties’ contract, and the written act serves as full proof of the parties’ transfer. La. C.C. art. 1839. Article 1839 further shows that the instrument had effect against third persons upon its registry. See also La. C.C. art. 3338. The trial court’s ruling on the issue of ambiguity within the instrument’s “four corners” was therefore required under this law for immovable property transfers, as an important first “issue” in this case.
| ^Appellants persist on appeal in their assertions of the ambiguity of the instrument, pointing to its lack of any property description for the 1805.34 acres and its expression of “TEN DOLLARS ($10.00) together with other good and valuable consideration” (hereinafter “$10 and OVC”). First, the well established rule of our law of registry is that an instrument affecting an immovable may state the requisite description of the immovable by reference to another recorded act containing the complete description. Nitro Energy, L.L.C. v. Nelson Energy, Inc., 45,201 (La. App.2d Cir.4/14/10), 34 So.3d 524. While that rule specifically concerns the sufficiency of notice to third parties for identifying the immovable property affected by the transfer, such sufficiency or clarity also governs between the parties to the act. Here, the parties’ previously recorded Lease contained a proper description of the 1805.34 acres. Therefore, the Extension Agreement’s reference to the Lease for the “full description of the lands covered thereby,” makes clear and unambiguous the 18-month extension of the primary term for all lease acreage.
*462 Likewise, the use of $10 and OVC for a statement of the bonus payment for the Extension Agreement does not make the instrument ambiguous.[7] The Plaintiffs expressed a clear statement of their receipt of a Invaluable consideration and have not asserted that Matador’s agreement to pay them $10,559.85 was breached or that no payment was ever made.[8] Furthermore, since this issue of ambiguity also is important for Petrohawk’s assignment of error regarding its later lease with Comegys, her execution of the Extension Agreement for $10 and OVC does not make the recorded instrument ambiguous, lacking clear notice to the third parties, Petrohawk and Chesapeake, who later acquired then-lease rights.

The Reformation Action under Civil Code Article 18Jp8

Enforcement of the parties’ contract from proof within the “four corners” of the writing under Civil Code Article 1839 is not however without exception. The exception follows in the same chapter of the Civil Code as Article 1848, which provides:
Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.
La. C.C. art. 1848. “This article deals with the situation where a party to a written contract is trying to prove that the contract exists but differently from the way it was written.” Frank v. Motwani, 513 So.2d 1170, 1172 (La.1987). Thus, even though the written act affecting the immovable is unambiguous and its contents generally should not be varied or negated but applied as written, the exception occurs when a party to the instrument: (1) 12Sasserts that a vice of consent caused the written act to improperly reflect the mutual intent of the parties, and (2) offers evidence deemed by the court to be sufficient in its quality so that “in the interest of justice,” the modification of the written act is allowed, giving effect only to the portion of the parties’ agreement unaffected by a vice of consent.[9]
*463 Article 1848 is Louisiana’s so-called par-ol evidence rule. Prior to the 1984 Civil Code revision, the parol evidence rule of the former Article 2276[10] did not include the second sentence now contained in Article 1848. Article 2276 of Civil Code (1870). Drawing from common law sources, the pre-revision jurisprudence nevertheless had created exceptions to the rigid parol evidence rule, one of which was the reformation action pertaining to written acts affecting an immovable. See, e.g. Wilson v. Levy, 234 La. 719, 101 So.2d 214 (1958) (where the assertion of the rigid parol evidence rule was rejected and a deed containing an erroneously broad description of 330 acres of land was reformed and limited to 300 acres). In fashioning the reformation action as an exception to express law, the courts described it as an “equitable" remedy, and required clear and convincing extrinsic evidence to overcome the weight of the written act. See, Sonnier v. Conner, 43,811 (La.App.2d Cir.12/3/08), 998 So.2d 344, 354 note 4, writ denied, 09-0309 (La.4/3/09), 6 So.3d 773. The new second sentence of Louisiana’s parol evidence rule expressed in Article 1848 is codification of the prior jurisprudential exceptions, allowing flexible judicial discretion “in the interest of justice” for the admission of evidence of such weight to challenge a written instrument. The reformation action therefore is now addressed in the Code by the effect of Articles 1839 and 1848, and the article for a “vice of consent,” Article 1949 discussed below.
The gatekeeper role of the trial court under Article 1848 arguably supersedes the former jurisprudential use of a “clear and convincing” evidentiary standard for a reformation action employed prior to the revision of the parol evidence rule. Cf. Talbot v. Talbot, 03-0814 (La.12/12/03), 864 So.2d 590 (where the court considered the application of a clear and convincing burden of persuasion in the absence of a statutory directive). The testimonial assertions may not be the mere subjective whims expressed by parol evidence of a party wishing to withdraw from his written act, as the trial court is given the discretion to admit or refuse evidence depending upon its quality.

Error as the Vice of Consent for Reformation

The Plaintiffs’ next assignment of error concerns the trial court’s ruling which prevented the jury’s consideration of so-called unilateral error. The partial pretrial judgment on the one hand dismissed the issue of “unilateral error.” On the other hand, it denied defendants’ motion to dismiss the issue of “mutual error.”
[snThe Civil Code’s chapter on “Vices of Consent” for conventional obligations addresses, in Section 1, “Error” that vitiates consent to the contract. La. C.C. arts. 1948, et seq. The two primary articles on error provide as follows:
Article 1949: Error vitiates consent only when it concerns a cause without which the obligation would not have been in *464 curred and that cause was known or should have been known to the other party.
Article 1950: Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should in good faith have regarded, as a cause of the obligation.
As can be seen, our civilian provisions on “error” do not utilize the terms “unilateral error” or “mutual error,” and nowhere in the Civil Code is any distinction between the two expressly addressed.[11]
As a result of the trial court’s ruling, the jury was not instructed with the only codal provision defining error, Article 19k.9. This article was viewed by the trial court as applicable to “unilateral error,” which its ruling excluded. With so-called “mutual error” missing from the codal section on error for vices of consent, the issue of error in this reformation action was presented without any codal guidance to the jury as follows:
It is not enough to prove that one party did not agree to the terms of the contract as written. Instead, the Plaintiffs must prove by qlear and convincing evi-denee that Defendant did not agree to the terms of the contract either.
|s1From the official Revision Comments of Article 1949, the Civil Code’s provisions on “cause,” and the commentary of Professor Litvinoff given before and after the Code’s 1984 Revision, we find that error can result in the annulment of a contract, or its partial rescission in a reformation action,[12] when the consent of either one or both of the parties is vitiated by mistake. La. C.C. art. 1949 and Revision Comments; La. C.C. arts. 1966, et seq.; Saul Litvinoff, “Error” in the Civil Law, Essays on the Civil Law of Obligations, 222 (J. Dainow ed. 1969); Litvinoff, Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion, 50 La.L.Rev. 1 (1989). In a bilateral contract where “the obligation of each party is correlative to the obligation of the other” (La.C.C. art. 1908), each of those obligations might be expressed by the parties in error. “Cause is the reason why a party obligates himself’ (La.C.C. art. 1967), and the consent of both parties expressing cause may be in error as embodied in their written contract. For example, if both parties intended the sale of Blackacre, the erroneous description in their deed of Whiteacre is mutual error. Likewise, if Blackacre and White-acre are contiguous and owned by the vendor, a deed describing both tracts is in *465 error and can be reformed to include only Blackacre when the same mutual intent for the one tract existed when the deed was drawn.
| sain such cases of mutual error, the error might be said to consist of a wrong belief shared by both parties. Lit-vinoff — Vices of Consent, supra at 34. With such mutual mistake, the cause of each of the reciprocal obligations of the parties is in error and the contract is a nullity.[13] La. C.C. art. 1966 (“An obligation cannot exist without lawful cause.”); Revision Comment (d) of La. C.C. art. 1949. While this civilian notion of “mutual error” is not addressed in Section 1 of the chapter on Vices of Consent, it is still clear error finding its roots in Civil Code Article 1966 and nullifying the obligations of both parties to a bilateral contract for lack of cause.[14]
The 1984 revision of the 27 articles on error in the Civil Code of 1870 resulted in the inclusion in the Civil Code of only the two articles quoted above, Articles 1949 and 1950. Referring to former Civil Code Article 1826, Professor Litvinoff explained new Article 1949 as follows:
Louisiana courts solved the riddle presented by the articles on error of the Civil Code of 1870 by reaching two clear conclusions: First, for an error to be a valid ground for rescission, it must bear on the cause of the obligation, and, second, the cause must have been known, or should have been known, to the other party. The article requiring knowledge of the cause by the other party was elevated toj^the rank of a fundamental article, as if it prescribed a rule that presided over all the others dealing with error.
Litvinoff—Vices of Consent, supra at 48. That presiding rule is now Article 1949, for all Louisiana cases where error is claimed to have legal significance, including a reformation action.
The operation of this prevailing and singular codal definition of error under Article 1949 is notably not without mutual mistake on the part of both parties to the bilateral exchange. While only one party’s reason or cause for the contract is wrongly expressed in his consent to the contract, that error alone will not allow for rescission of the contract unless the other party can be said to be responsible for his knowledge, actual or constructive, of the mistaken reason of the first party. While not the same as mutual mistake affecting the cause of both parties’ obligations, the sharing of mistake addressed in Article 1949 makes neither party innocent of the *466 error, thus invalidating the expression of mutual intent in their contract. Rescission, or partial rescission in the case of reformation, applies. Litvinoff, “Error” in the Civil Law, supra (where under the subcaption “The Problem of Mutual Error,” Professor Litvinoff reviews the source article to Article 1949, former Article 1826); Revision Comment (d), La. C.C. art. 1949.
Turning to the actual pleadings of Plaintiffs, while we see the legal conclusion of “mutual error” in the petition and amended petition, we do not find assertions of direct evidence of the so-called mutual error. There are no fact allegations that the parties' explained to themselves in their negotiations and shared agreement, or mutual erroneous consent, that the Deep Rights would be excluded from their contract. Likewise, there is no allegation that | ^Matador intended the written acreage description in the Extension Agreement to apply only to the 168.95 Acres. There is no allegation of written correspondence by Matador expressing that it did not desire the inclusion of the Deep Rights in the extension. Instead, the allegations were that the parties never discussed in shared negotiations whether the Deep Rights would be extended and that their only mutual intent expressed in such discussions and written exchanges concerned the extension of the Lease as to the 168.95 Acres. Most significantly, the Plaintiffs alleged that Matador and Prestige “were aware” that Plaintiffs held mistaken beliefs regarding the depths held by the existing production and the effect of the Extension Agreement on the Deep Rights.
With these allegations, we find that the trial court’s partial summary judgment ruling improperly excluded the fundamental measure of error in the Civil Code provided under Article 1949. As a result, as seen from the above quoted jury charge, Plaintiffs were placed under the more onerous burden of proving that Matador and the Plaintiffs together “did not agree” with the 1805.34-acre description as written into the Extension Agreement and that their mutual mistake in using that wrong property description conflicted with their common “cause” to limit the extension to the 168.95 Acres. In contrast, the burden of proof under Article 1949 requires only that Matador should have known that Plaintiffs’ cause or reason for granting the additional lease rights was limited to the 168.95 Acres. Such test for actionable “error” within these disputed facts went unaddressed by the jury.
|SfiIn summary, the reformation action addressed under Article 1848 requires a showing of a “vice of consent,” which the article does not limit to “mutual error.” Revision Comment (d) of Article 1949 shows that “as an alternative” to total rescission, reformation of the written contract affected in part by error under Article 1949 is the remedy to carry out the common intent of the parties. The comment therefore ties Article 1848’s rule for the reformation of a written act to the “vice of consent” of error addressed by Article 1949.

Trial Court Error Regarding the Jury Charge

In Nicholas v. Allstate Ins. Co., 99-2522 (La.8/31/00), 765 So.2d 1017, the Louisiana Supreme Court addressed the issue of an erroneous jury charge as follows:
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Melancon v. Sunshine Const., Inc., 97-1167 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011. The basis for this rule of law is that trial courts are given broad discretion in formulating *467 jury instructions and it is well accepted that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law. United States v. L’Hoste, 609 F.2d 796, 805 (5 Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. Smith v. Travelers Ins. Co., 430 So.2d 55 (La.1983). In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if they adequately provide the correct principles of law as applied to the issued framed in the pleadings and evidence and whether they adequately guided the jury in its deliberation. Kaplan v. Missouri-Pacific R.R. Co., 409 So.2d 298, 304-05 (La.App. 3 Cir. 1981). Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. Brown v. White, 405 So.2d 555, 560 (La.App. 4 Cir.1981), ajfd, 430 So.2d 16 (La.1982).
Id. at 1023. See also, Wooley v. Lucksinger, 09-0571, 09-0584, 09-0585, 09-0586 (La.4/1/11), 61 So.3d 507.
In this case, the jury charge did not inform the jury that even though the Extension Agreement unambiguously extended the lease rights for 1805.34 acres, including the Deep Rights, the written contract could be reformed or varied to correct a vice of consent proven under Article 1949. Neither the Civil Code’s definition of cause for one’s contract under Article 1967, nor Article 1949’s measure of error affecting a party’s cause for the contract was given to the jury for application in considering the alleged vice of consent in this case. We find that this erroneous charge without the substance of Articles 1967 and 1949 misled the jury concerning the proper law for this reformation action. This prevented the jury from properly dispensing justice. We will therefore address the facts from the record de novo for Plaintiffs’ appeal of the judgment.
II.
Considering the evidence for Plaintiffs’ reformation claim and the alleged vice of consent of error, we initially return to the language of the Extension Agreement. By merely making reference to the recorded Lease “for a full description of the lands covered,” there is no specific expression in the written act that “1805.34 acres” were affected by the extension. The same is true with the abbreviated expression of Matador’s payment of $10 and OVC. While we have rejected Plaintiffs’ legal argument concerning ambiguity of the Extension Agreement, these valid shorthand expressions do leave room for error. In other words, the written act does not state: |S7“This extension grants lease rights to 1805.34 acres for all depths and formations for the bonus of $12,671.25 calculated on 168.95 acres times $75 per acre.” This lack of complete specificity of the substance of the transaction within the written act is a factor that weighs in Plaintiffs’ favor for their claim of error.
Second, we find that the extension of the primary term for the 1805.34 acres by the Extension Agreement was overly broad in its coverage, even from Matador’s perspective for its reason or cause for the contract. After the end of the primary term and the completion of the Peironnet 29 Well, Matador was under the 90-day time constraint imposed by the Pugh clause which would likely cause the loss of its lease rights in Sections 31 and 35 and the Deep Rights. Matador was not under any *468 time constraint for its producing Cotton Valley acreage down to the active depths of those producing units. Matador did not desire to pay for the extended respite period of 18 months for the productive Cotton Valley acreage since that acreage was expected to remain fully held by production indefinitely. Yet, its broad language did not exclude from the force of the extension the grant of a new 18-month primary term for the active, producing Cotton Valley acreage. Thus, Matador’s use of the broad general description for the 1805.34 acres cannot be interpreted as an accurate reflection of its own intent to obtain a new primary term for all rights under the Lease. Cf., La. C.C. art. 2051. In this respect, there was even error in the writing concerning Matador’s cause for the contract.
|ssThird, the important policy concerning Louisiana’s requirement for written transactions affecting immovables means that the quality of the extrinsic evidence offered under Article 1848 to vary the written contract be more than the mere parol attack by the subjective and self-serving expressions of the complaining party. Here, Plaintiffs challenged the written contract with other significant written expressions from Matador through its agents and other objective evidence. The Deep Rights under the active Cotton Valley units as defined herein have no connection with the 168.95 Acres. Plaintiffs’ attack on the scope of the Extension Agreement rests significantly on the following written statements from Matador’s correspondence referencing only the 168.95 Acres:
• Written caption on May 15 Letter listing only Sections 31 and 35 (the 168.95 Acres)
• “Lease will expire on June 22, 2007 as to all acreage situated outside currently producing units.”
• <£We will need more time under the lease for us to develop your acreage in Sections 31 and 35.”
• Color-coded plat prepared by Prestige “to show the lands we are interested in renewing.”
• Lease expiration after the primary term will occur “as to all acreage situated outside of the currently producing units.” (June 11, 2007 letter from Moüton)
Thus, Matador’s directing the focus upon the “renewal” or extension of the 168.95 Acres alone in this correspondence is evidence that Matador should have known that Plaintiffs’ reason for extending the lease rights could be limited mistakenly to the 168.95 Acres.
LnFourth, the evidence is undisputed that in all the exchanges between the parties leading up to the execution of the Extension Agreement, there were no discussions between them concerning the Deep Rights, the fact that the Deep Rights would also no longer be affected by the Lease upon the occurrence of the Pugh Clause Event, or Matador’s desire to “renew” the Deep Rights by the execution of the Extension Agreement. Such void in the negotiations does not mean that Matador did not have cause or reason to obtain extension of the Deep Rights. Matador’s agents who dealt with Plaintiffs in 2007 undisputedly asserted their knowledge of that cause for the contract. Nevertheless, despite the broad expression of the “full description of lands” in the Extension Agreement which made the extension applicable as written to the entire Lease, express negotiations concerning the Deep Rights did not occur.
Under Articles 1949 and 1950, the Plaintiffs’ “cause” of the contract which allegedly was affected by error concerned “a substantial quality of that thing” which they conveyed in 2007 to Matador. The thing is *469 the incorporeal immovable consisting of the mineral lease rights which were subject to the release in Plaintiffs’ favor caused by the operation of the Pugh clause. In view of the beneficial effect of the Pugh clause for the lessors, the release of the unexplored portion of the Plaintiffs’ lands in Sections 31 and 35 (the 168.95 Acres) is no different from the release of the unexplored depths and formations below the Cotton Valley formation (the Deep Rights). From the inception of the Lease, the “cause” or reason for the Pugh clause was to provide that benefit to Plaintiffs. Because of the impending |4nPugh Clause Event, Matador sought to “renew” by the payment of new bonus monies the portion of Plaintiffs’ rights released by the Pugh clause.
In this context and from the above review of the facts, we find (1) that the cause for Plaintiffs’ obligation granting extended lease rights to Matador was to receive payment on a per acre basis and was limited to their rights in the 168.95 Acres; and (2) that Matador should have known that Plaintiffs’ conveyance of lease rights was intended to be limited to the 168.95 Acres so that Plaintiffs were in error in their execution of the 1805.34-acre Extension Agreement.
The principal evidence supporting both conclusions rests on objective evidence originating directly with Matador. Its written correspondence did not state that expiration of the Lease rights after the primary term would occur “as to all acreage situated outside of the currently producing units” and the Deep Rights underlying those units. Only the quoted reference to the 168.95 Acres was called to Plaintiffs’ attention. Second, Matador’s calculation and payment of the renewal bonus proceeds, its counterpart obligation in the economic exchange, was limited only to the 168.95 Acres, the rights to which were extended on the customary per acre basis of $75/aere. The error is therefore demonstrated because Plaintiffs’ obligation extending the lease rights to all 1805.34 acres entailed only a corresponding obligation on the part of Matador to pay for the 168.95 Acres and not the extended Deep Rights. Therefore, in the application of Articles 1848 and 1949 for the assertion of the vice of consent of error, our conclusions do not rest merely on an examination of Plaintiffs’ subjective will and intentions |41not to renew and extend the Deep Rights, but on the consideration of these objective facts of Matador’s actions. These objective facts are clear and convincing evidence of error under the test of Article 1949.
Accordingly, we reverse the judgment insofar as it determined that the Deep Rights were extended by the Extension Agreement and remained subject to the Lease and owned by Chesapeake as a result of its assignment from Matador. The Extension Agreement is hereby reformed to include only Plaintiffs’ rights in the 168.95 Acres in Sections 31 and 35. The Lease has expired as to the Deep Rights for the remaining 1636.39 acres.
We further declare that Matador’s extended primary term of the Lease regarding the 168.95 Acres shall remain in effect following the finality of this judgment for 220 days. This period represents the time between the filing of Plaintiffs’ suit on May 15, 2008, and the end of the extended term on December 22, 2008. Plaintiffs’ suit, in which they prayed for total rescission of the Extension Agreement for fraud, and their top leases granted and recorded in favor of Petrohawk in October 2008 represented a disturbance of Matador’s lease rights in the 168.95 Acres, which we now remedy with this ruling. Smith v. Kennon, 188 La. 101, 175 So. 763 (1937).
*470 III.
In Petrohawk’s separate assignment of error, it contests the trial court’s grant of a partial summary judgment dismissing its claim for lease rights to the one-sixth interest of Comegys. Comegys executed the Extension Agreement in the same document with her co-owners. However, after she had intervened in the suit in August 2008, she compromised her 142dispute with Matador and Chesapeake over the alleged error in the Extension Agreement, and in October 2009, her claims against them were dismissed from this suit with prejudice. Only after her dismissal did Petrohawk intervene in the suit in November 2009 reasserting Come-gys’ claim for error and reformation.
The critical events summarized chronologically are as follows:
• May 15,2008 Filing of Lis Pendens Notice of Suit
• August 1, 2008 Filing in Conveyance Records of Matador’s assignment to Chesapeake of the Deep Rights
• August 13, 2008 Comegys’ Oil and Gas Lease to Petrohawk of the Deep Rights (Lease recorded October 15, 2008)
• August 21, 2008 Comegys’ intervention in suit
• October 13, 2009 Judgment of Dismissal with prejudice of Comegys’ claim against Matador and Chesapeake based upon parties’ settlement
• November 25, 2009 Petrohawk’s intervention in suit asserting rights under Comegys’ lease
Chesapeake argues that Comegys settlement and dismissal of her claims for error and the reformation of the Extension Agreement represent the withdrawal of her personal action for the partial and relative nullity of the act. Chesapeake asserts that Civil Code Article 2031 makes Comegys’ claim for the relative nullity of the act her exclusive personal action, which prevents Petrohawk’s assertion of the error between Comegys and Matador, the parties to the original instrument. Article 2031 provides as follows:
A contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made. A contract that is only relatively null may be confirmed.
Relative nullity may be invoked only by those persons for whose interest the ground for nullity was established, and may not be declared by the court on its own initiative.
|43La. C.C. art. 2031. According to Chesapeake, since Comegys withdrew her claim of error that vitiated her consent with Matador in the extension of the Lease to the Deep Rights, Petrohawk may not reassert that claim for relative nullity.
As an additional consideration for the resolution of this issue, the relationship between the reformation action and the Louisiana public records doctrine, or law of registry, must be examined. We have ruled above that, as written, the Extension Agreement unambiguously extended the primary term of the entire Lease. Thus, Comegys’ act in signing the Extension Agreement likewise became a recorded clear conveyance of her rights to Matador. A third party viewing the public records could see that this written act established an 18-month extension granting rights in the immovable to Matador. La. C.C. art. 3338. As we have addressed it under Civil Code Articles 1839 and 1848, the reformation action is allowable between the parties to the instrument to reform its terms so long as the rights of third parties have not *471 intervened. The proof of a vice of consent by one party allowed under the second sentence of Article 1848 to vary a written contract affecting an immovable may not affect the prior recorded rights of a third party who relied on the recordation of the act in question. Lewis v. Saucer, 26,685 (La.App.2d Cir.4/5/95), 658 So.2d 1254 (“An instrument may not be reformed or corrected to the prejudice of third parties who are authorized to rely on the integrity of the instrument, or who have relied on the public record.”); La. C.C. art. 3388; cf. Revision Comment (c) to Article 1848.
|44Upon the filing of suit by Comegys’ co-owners in May 2008, the notice of lis pendens gave recorded notice to third parties, such as Chesapeake, that the Extension Agreement was in dispute. As a party to the Extension Agreement, Comegys later aligned herself in the suit with the claims of the co-owners to reform the act. Like the other Plaintiffs, Comegys’ claim was that, despite the unambiguous written conveyance to Matador of an extended mineral lease affecting the Deep Rights, her error or vice of consent required reformation. The recorded lis pendens gave notice to third parties that the error or vice of consent between the lessors and Matador was subject to resolution in this suit at the time Chesapeake recorded its assignment from Matador of Comegys’ lease rights in August 2008. Thus, the acquisition of the lease rights by Chesapeake as a third party to the Extension Agreement was also subject to Comegys’ dispute with Matador by virtue of the notice of lis pendens.
In October 2009, the situation changed when Comegys was no longer a party to the suit, as the result of the judgment of her dismissal with prejudice. Therefore, the notice of the lis pendens in the public records ended insofar as the rights of Co-megys in the litigation were no longer in dispute. At that time, Petrohawk was not a party to the suit seeking to vindicate its rights in the immovable property because of Comegys’ error regarding the Extension Agreement, and it cannot assert that the lis pendens in October 2009 prevented Chesapeake’s recorded rights obtained from Matador in 2008 from finding protection under the public records doctrine.
14SWith this ruling we need not address whether Petrohawk’s real right under its top lease with Comegys was subject to the exercise of an exclusive personal right of Comegys to bring the action for a relative nullity under Article 2031.[15] Petrohawk’s real right had no protection under the public records doctrine in October 2009 which operated in Chesapeake’s favor. At that time, Comegys had granted extended lease rights to Matador of her undivided one-sixth interest. That conveyance, recorded in 2007, granted a “valid mineral lease” by a co-owner of land under Mineral Code Article 166. La. R.S. 31:166. Come-gys had been dismissed by judgment as a party to the suit and the notice of lis pendens recorded in May 2008 no longer revealed in October 2009 a challenge to her recorded grant to Matador. Thus, the next recorded act is Chesapeake’s acquisition of the Deep Rights from Matador in August 2008. The combination of those facts revealed in the public records gave Chesapeake its real right in the Lease which is derived from Comegys by record *472 ed acts prior to the time of her top lease to Petrohawk.
Accordingly, the trial court’s partial summary judgment recognizing Chesapeake’s lease rights derived from Come-gys’ undivided one-sixth interest is affirmed.

\ ^Conclusion

For the foregoing reasons, the judgment in favor of appellees is reversed in part insofar as it declared that the Lease remained in force and effect for the Deep Rights below the producing Cotton Valley production for the 1636.39 acres in Sections 23, 24, 25, 26 and 36 of Township 15 North, Range 12 West and Section 29, Township 15 North, Range 11 West, following the Pugh Clause Event. It is hereby adjudged and decreed that the Lease shall continue in full force and effect for 220 days following the finality of this judgment for Plaintiffs’ lands in Section 31, Township 15 North, Range 11 West and Section 35, Township 15 North, Range 12 West at which time the extended primary term of the Lease for said land shall end.
The trial court’s “Judgment on Motion for Partial Summary Judgment Related to Claims of Pamela Jeter Comegys” signed on April 15, 2010, in favor of Chesapeake Louisiana, LP, et al. and against Petro-hawk Properties, L.P., is hereby affirmed.
The case is remanded to the trial court for the remaining issues concerning Plaintiffs’ damage claims, and any other matters reserved by the parties in advance of the jury trial.
Costs of appeal are assessed to Appel-lees.
REVERSED IN PART; AFFIRMED IN PART; PARTIAL JUDGMENT RENDERED; REMANDED.

. During the litigation, Peironnet transferred her oil and gas interests to the Cynthia F. Peironnet Family, L.L.C. Franklin also created a corporation, Small Fry, L.L.C., for this purpose as well. They later filed an Act of Correction in order to individually reverse/retain their claims and any damages relating to this current litigation.

. Coastal was actually the corporation hired to obtain the lease extension. Both Coastal and Prestige are corporations owned by Guar-ino. They employ the same agents, and were stated to be virtually one and the same by the witnesses. They will both be collectively referred to as "Prestige.”

. Marceaux's actual date of execution of the Extension Agreement was September 7, 2007.

. The Haynesville Shale formation was also unitized on a sectional basis and in June 2008, the CLD23H Well commenced in Section 23, Township 15 North, Range 12 West, affecting the Deep Rights to the Plaintiffs’ acreage in that Section.

. The fraud and unjust enrichment claims eventually sought the value which Matador realized in its $32 million assignment of the Deep Rights.

. The parties debated the date that the Pugh clause would be triggered in the absence of an extension of the lease. This debate centered around Matador’s “continuous drilling operations” at the end of the primary term. While the Plaintiffs argued that it was a reso-lutory condition and thus expired retroactively to the date of Matador’s completion of the Peironnet 29 Well, the defendants argued that they were given the 90 days after completion of the well, regardless of whether they satisfied the condition and spudded another well before the end of the 90 days.

. We have reviewed the jurisprudence involving disputes over the use of "other valuable consideration" language in the expression of the price or consideration. Johnson v. Johnson, 191 La. 408, 185 So. 299 (1938); GNC Ltd. Partnership v. Dooley, 95-9 (La.App. 3d Cir.5/17/95), 657 So.2d 255; Kinney v. Kinney, 150 So.2d 671 (La.App. 3d Cir.1963); Girard v. Donlon, 127 So.2d 761 (La.App. 3d Cir.1961); Nofsinger v. Hinchee, 199 So. 597 (La.App. 1st Cir.1941). These cases involved disputes between the parties to the instrument or their heirs, and parol evidence was considered to withdraw, explain, negate or vary the stated expression that "valuable consideration” was given. Nevertheless, these disputes between the parties do not make the transferor’s stated expression of receipt of valuable consideration ambiguous. Moreover, since the issue of lesion for the sale of immovables does not apply to transactions involving mineral rights, La. R.S. 31:17, there is widespread use of the $10 and OVC expression in mineral transactions. Third parties acquiring rights in relation to those mineral transactions may view the recorded transactions and the expression of consideration as unambiguous unless a dispute between the parties has resulted in litigation and the filing of notice of lis pendens has occurred.

. Plaintiffs' inadequacy of consideration assertion in their petition related to Moore’s authority to exceed the scope of his authority and execute a donation.

. Surprisingly, in the excellent and extensive briefs to this court by counsel, none of the parties cited or reviewed Article 1848 and its important revision to the parol evidence rule in 1984 which placed for the first time the reformation action into a codal context as *463 clearly recognized by the Louisiana Supreme Court in Frank, supra. At oral argument, when Article 1848 was referenced to counsel by this court, counsel for Matador agreed that Article 1848 was central to the task placed before the jury for the possible reformation of the Extension Agreement alleged by Plaintiffs. Nevertheless, neither Article 1848 nor Article 1949 (the only Civil Code article defining error in its chapter on Vices of Consent, as discussed below) was included within the jury charge, and no statement was given of the trial court’s ruling that the written act was unambiguous.

. Former Article 2276 provided: Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before or at the time of making them, or since.

. The early jurisprudential references to "mutual error" cite common law authority in the use of the term. See Vernon V. Palmer, Contractual Negligence in the Civil Law—The Evolution of a Defense to Actions for Error, 50 Tul.L.Rev. 1 (1975). After stating that either party is permitted in the reformation action to correct the written instrument to express the mutual intent for the contract, the jurisprudence would then refer to the vice of consent affecting the instrument as mutual error or mistake. See Reynaud v. Bullock, 195 La. 86, 196 So. 29 (1940).

. Our conceptual understanding of this reformation action is that part of the disputed contract is acknowledged by Plaintiffs as enforceable, reflecting the parties’ mutual intent. Yet, the extension of the lease rights to the other part is sought to be rescinded because of error regarding that part, the Deep Rights. With this view, statements in the jurisprudence from common law sources such as, "[a] mistake on one side may be a ground for rescinding, but not for reforming, a contact,” Weber v. H.G. Hill Stores, Inc., 210 La. 977, 29 So.2d 33, 38 (1946), make an inaccurate assessment of the partial rescission occurring within certain reformation actions such as the present.

. In contrast, former Civil Code Article 1881 showed that the contract made through error or fraud affecting the consent of one party was "not absolutely null,” but "voidable” as a relative nullity by the party whose consent was affected. Article 1881 of the Civil Code (1870). The same relative nullity principle underlies Section l's provisions for error as a vice of consent. See La. C.C. art. 1951.

. The absence of a codal pronouncement for "mutual error” within Chapter 4, Section 1, reflects that a case where each party would agree, or could be shown easily to have agreed, that the consent of the parties embodied in their contract was without cause is exceptional. Such case, practically speaking, would not be expected to rise to a level of litigation requiring codal regulation of a vice of consent. Therefore, the regulated vices of consent in the Code, error, fraud, and duress, are all of a unilateral nature. As aptly observed by the court in Prejeant v. Hero Lands Co., 244 So.2d 613 (La.App. 4th Cir.1971): "We note defendant’s argument that reformation can only be had in case of mutual error, and that defendant shows it was not under any error. This argument ignores the paradoxical truism that every defendant in a case alleging mutual error denies the error; otherwise he would have consented to an extrajudicial act of correction and there would have been no lawsuit.”

. We must note that Chesapeake's characterization of Comegys’ claim as a relative nullity in its argument against Petrohawk is contrary to appellees' argument against Plaintiffs that reformation of an instrument is only permissible upon the showing of mutual error. Error under Article 1949 affecting one party’s cause for the contract results in a relative nullity. See note 12, supra. Mutual mistake or error concerning the cause of both parties to the contract results in an absolute nullity. La. C.C. art. 1966.